UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| MARK SCHUMACHER AND ANDREA SCHUMACHER, et al., | : | No. 1:13-cv-00232 |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | **OPINION AND ORDER** |
| | : | |
| STATE AUTOMOBILE MUTUAL INSURANCE CO., et al., | : | |
| | : | |
| Defendants. | : | |

This matter is before the Court on the Motion to Dismiss by Defendants State Automobile Mutual Insurance Company, State Auto Financial Corporation, and State Auto Property and Casualty Insurance Company (doc. 8); Plaintiffs' response in opposition (doc. 15); Defendants' reply (doc. 16); and Plaintiffs' sur-reply (doc. 23), filed with the Court's permission (doc. 22). Oral argument was heard on August 29, 2013. For the reasons that follow, Defendants' motion is **GRANTED IN PART AND DENIED IN PART**.

I. **Background**

Plaintiffs Mark and Andrea Schumacher, residents of Kentucky, filed the original Class Action Complaint in this case against three Defendants, State Automobile Mutual Insurance Company, State Auto Financial Corporation and State Auto

Property and Casualty Insurance Company (see doc. 1). The First Amended Class Action Complaint names the same three defendants but adds five more Plaintiffs: Mary Carmen Evans, a resident of Ohio (doc. 7 ¶ 2); Mary and Arthur Maier, also residents of Ohio (id. ¶ 3); and Calvin and Gabrielle Hendryx-Parker, residents of Indiana (id. ¶ 4).

By way of background, the standard homeowners policy sold in the United States is referred to as an "HO0003" and includes the following coverages: Coverage A (for the dwelling), Coverage B (other structures), Coverage C (personal property) and Coverage D (loss of use). The customary levels of coverage are: Coverage B (10% of Coverage A), Coverage C (50% of Coverage A) and Coverage D (20% of Coverage A). If an insured's policy limits for the dwelling and other structures (Coverage A and Coverage B) equals 80% of the structures' full replacement cost, under policy HO0003 the insured is entitled to payment of full replacement costs for damaged or destroyed property up to policy limits. (Id. ¶¶ 26-32.)[1] Through an endorsement known as its "Defender Coverage," State Auto markets another product to its customers that professes outright to provide "100% replacement cost coverage." Its levels of coverage are:

---

[1] State Auto markets a slightly different version of policy HO0003, known as Securgard. The only variation is that Coverage D limits are 30% (rather than 20%) of Coverage A. (Doc. 7 ¶ 34.)

Coverage B (10% of Coverage A), Coverage C (70% of Coverage A) and Coverage D (30% of Coverage A).[2] (Id. ¶ 35.) Policyholders with the Defender Endorsement give State Auto full authority to adjust the Coverage A (the dwelling) limit and corresponding premium in accordance with property evaluations made by State Auto and any increases in inflation (id. ¶ 38).

According to Plaintiffs, use of the catch-phrase "100% replacement cost coverage" in the Defender Endorsement creates an impression that a homeowner needs to purchase this endorsement in order to be adequately insured (id. ¶ 36). However, as long as the structures are insured at 80% of their full replacement cost, policy HO0003 provides that protection (id. ¶ 32). Beginning in 2009, State Auto advised Plaintiffs, as insureds with the Defender Endorsement, that it was introducing its "Insurance-to-Value" Program ("ITV program") for the purpose of re-evaluating the replacement cost of their homes (id. ¶ 52 & Exh. 1). Plaintiffs claim that, under the guise of this program, State Auto improperly raised their premiums to offset underwriting losses incurred because of an increased number of climatic events such as hurricanes, tornados, floods and earthquakes (id. ¶¶ 40-42). Specifically, Plaintiffs allege

---

[2]The Defender Endorsement also purports to provide an additional amount of insurance, up to 25% of the Coverage A limits, if losses under Coverage A exceed the liability limit (doc. 7 ¶ 37).

that State Auto has increased coverage limits for Coverage A far in excess of the actual value of their property (id. ¶ 43).   An increase in coverage limits, of course, means an increase in the premiums paid by them.   Plaintiffs contend that, because the replacement cost of their homes would be well below the inflated amount of the coverage limit, State Auto has assumed no additional risk yet received more in premiums.   And by increasing Coverage A limits, in turn the coverage limits for Coverage B, Coverage C and Coverage D also were increased as they are calculated as a percentage of Coverage A.   (Id. ¶¶ 45.) Moreover, these unilateral increases in Coverage A limits effectively eliminated any chance that State Auto ever would be required to provide the 25% bonus guaranteed by the Defender Endorsement, rendering illusory the bargained-for benefit (id. ¶¶ 37, 44).

For example[3], the Schumacher Plaintiffs purchased their new construction home, located in Campbell County, Kentucky, in 2001 for $234,500 (id. ¶ 72).   Their independent insurance agent sold them a homeowners policy issued by State Auto with its Defender Endorsement (id. ¶¶ 72, 73).   Since 2001, Plaintiffs have not made any significant improvements to their home that would trigger a substantial increase in property value, but have

---

[3]For purposes of deciding the matter before us, it is unnecessary for the Court to recite the particular facts attendant to each named Plaintiff.

4

instead engaged in normal maintenance only (id. ¶ 77). The value of their property has not otherwise materially appreciated, but has remained basically stagnant (id. ¶¶ 75-76). The builder from whom Plaintiffs bought their home continues to construct and sell—for a comparable price—homes in their neighborhood that are similar to the one they own (id. ¶ 78). For the period 10/19/2010 to 10/19/2011, State Auto increased the limits for Plaintiffs' dwelling (Coverage A) to $339,500, more than $100,000 in excess of the original purchase price. In turn, their Coverage C limits (70% of Coverage A) rose to $237,650 even though they had no unusual person property or collections. Their total premium was $889. (Id. ¶¶ 79-81 & Exh. 3.) For the period 10/19/2011-10/19/2012, State Auto again increased the limits for Plaintiffs' dwelling, this time to $408,400, even though no material changes to the property occurred. In turn, again, their Coverage C limits rose to $285,880. Their total premium was $1,090. (Id. ¶¶ 82-84 & Exh. 4.) For the period 10/19/2012-10/19/2013, State Auto continued its pattern, increasing the limits for Plaintiffs' dwelling to 503,600, with Coverage C rising to $352,520. Their total premium was $1,381. (Id. ¶¶ 85-87 & Exh. 5.) Plaintiffs contend that, in three year time period, State Auto raised their coverage limits over 48%, and, in turn, their premiums more than 55%, all purportedly because of the need to provide adequate

replacement cost coverage (id. ¶ 88). Plaintiffs further contend, in the Commonwealth of Kentucky alone, in the wake of the ITV program, State Auto increased its revenues from homeowner policy premiums by $1,130,636 for the period 2010-2012[4], yet had 7,158 fewer policyholders in this time band[5]. Thus, State Auto realized a 3.4% increase in premiums on 20.4% fewer properties. (Id. ¶ 66.)

Plaintiffs have pled six causes of action on behalf of themselves and the putative class: tortious breach of the duty of good faith and fair dealing (doc. 7 ¶¶ 183-201 (Count I)); negligent misrepresentation and fraud (doc. 7 ¶¶ 202-219 (Count II)); violation of the Ohio Deceptive Trade Practices Act (doc. 7 ¶¶ 220-227 (Count III)); fraudulent inducement (doc. 7 ¶¶ 228-238 (Count IV)); breach of contract (doc. 7 ¶¶ 239-245 (Count V)); and breach of the duty of good faith and fair dealing (doc. 7 ¶¶ 246-251 (Count VI)).

Defendants' 12(b)(6) motion asks the Court to dismiss all six claims. In the alternative, Defendant State Auto Financial Corporation asks to be dismissed because it is not alleged to have insured any of the Plaintiffs. Also in the alternative, Defendants ask that Plaintiffs Mary Carmen Evans and Plaintiffs

---

[4]State Farm collected $34,351,476 in premium revenue from its Kentucky insureds in 2012 as compared to $33,220,840 in 2010.

[5]State Farm had only 35,045 Kentucky insureds in 2012, as compared to 42,203 in 2010.

Calvin and Gabrielle Hendryx-Parker be dismissed because the declaration pages attached to the First Amended Class Action Complaint show that they were not insured by the Defendants specifically named in this action.

## II. Applicable Standard Under Rule 12(b)(6)

In Bell Atlantic Corp. v. Twombly, the Supreme Court retired the half-century-old pleading standard of Conley v. Gibson that a claim should not be dismissed "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Twombly, 550 U.S. 544, 546 (2007) (citing Conley v. Gibson, 355 U.S. 41, 45-46 (1957) (emphasis added)). Federal Rule of Civil Procedure 8(a)(2) "demands more than an unadorned, the defendant-unlawfully-harmed-me accusation." Kline v. Mortgage Electronic Security Systems, 659 F. Supp. 2d 940, 945 (S.D. Ohio 2009) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)). A pleading is insufficient if it only offers "a formulaic recitation of the elements of a cause of action" or tenders nothing more than "labels and conclusions." Twombly, 550 U.S. at 555. A complaint must "state a claim to relief that is plausible on its face" or risk dismissal under Fed. R. Civ. P. 12(b)(6). Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 570). While a court must accept as true all of the factual allegations of the complaint, it is not so bound with regard to

7

legal conclusions, particularly when couched as the former. <u>Iqbal</u>, 556 U.S. at 678-79 (citing <u>Twombly</u>, 550 U.S. at 555 (citing <u>Papasan v. Allain</u>, 478 U.S. 265, 286 (1986))).

**III. Discussion**

**A. Which State's Law Governs?**

As earlier catalogued, the First Amended Class Action Complaint contains a total of six causes of action: three sounding in tort, two in contract, and one based on an Ohio statute. A preliminary issue we must resolve is which state's law governs. Defendants maintain that the law from each named Plaintiff's home state should govern the common law claims. Thus, in their view, Kentucky law applies to the claims of the Schumacher Plaintiffs, Ohio law to the claims of the Evans and Maier Plaintiffs, and Indiana law to the Hendryx-Parker Plaintiffs. Plaintiffs, on the other hand, urge that, regardless of the state in which any named Plaintiff resides, Ohio law is applicable. Both sides agree that a federal court with diversity jurisdiction must apply the conflict of laws rules of the state in which it sits. <u>See</u> <u>Sky Tech. Partners, LLC v. Midwest Research Inst.</u>, 125 F. Supp. 2d 286, 295 (S.D. Ohio 2002) (citing <u>Klaxon Co. v. Stentor Elec. Mfg. Co.</u>, 313 U.S. 487, 496 (1941)). This Court quite obviously sits in Ohio, and Ohio courts confronted with a conflicts of law question apply the analysis set forth in the Restatement (Second) of

8

Conflict of Laws. <u>Macurdy v. Sikov & Love, P.A.</u>, 894 F.2d 818, 820-22 (6th Cir. 1990) (citing <u>Morgan v. Biro Mfg. Co., Inc.</u>, 15 Ohio St. 3d 339, 474 N.E.2d 286 (1984) (tort claims); <u>Gries Sports Enterprises, Inc. v. Modell</u>, 15 Ohio St. 3d 284, 473 N.E.2d 807 (1984) (contract claims)). As detailed below, we conclude that the law of the state in which each of the named Plaintiffs resides applies to their respective contract claims, but Ohio law applies to all claims sounding in tort.[6]

### B. Contract Claims

Section 188 provides:

(1) The rights and duties of the parties with respect to <u>an issue in contract</u> are determined by the local law of the state which, with respect to that issue, <u>has the most significant relationship to the transaction and the parties</u> under the principles stated in § 6[7].

_____

[6]<u>See</u> <u>Lewis v. Horace Mann Ins. Co.</u>, 410 F. Supp. 2d 640, 653 (N.D. Ohio 2005) ("[O]ne state's law need not be applied to all of the claims." (citing <u>Cheaham v. Thurston Motor Lines</u>, 654 F. Supp. 211, 215 (S.D. Ohio 1986) (Rice, J.))).

[7]Section 6 provides:

(1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.

(2) When there is no such directive, the factors relevant to the choice of the applicable rule of law include

(a) the needs of the interstate and international systems,

(b) the relevant policies of the forum,

(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

(2) In the absence of an effective choice of law by the parties (see § 187[8]), the <u>contacts to be taken into account</u>

_____

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result, and

(g) ease in the determination and application of the law to be applied.

Restatement (Second) of Conflict of Laws § 6 (1971).

[8]Section 187 provides:

(1) The law of the state chosen by the parties to govern their contractual rights and duties will be applied if the particular issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue.

(2) The law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue, unless either

(a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or

(b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

(3) In the absence of a contrary indication of intention, the reference is to the local law of the state of the chosen law.

Restatement (Second) of Conflict of Laws § 187 (1971).

in applying the principles of § 6 to determine the law
applicable to an issue include:

> (a) the place of contracting,
>
> (b) the place of negotiation of the contract,
>
> (c) the place of performance,
>
> (d) the location of the subject matter of the
> contract, and
>
> (e) the domicil, residence, nationality, place of
> incorporation and place of business of the parties.
> These <u>contacts are to be evaluated according to their</u>
> <u>relative importance</u> with respect to the particular issue.

Restatement (Second) of Conflict of Laws § 145 (1971) (emphasis
added).   When read together, sections 6 and 188 provide, at
best, "'a broad general framework for the resolution of choice
of law issues . . . .'" <u>Medical Mut. Of Ohio v. deSoto</u>, 245
F.3d 561, 571 (6th Cir. 2001) (quoting <u>International Ins. Co. v.</u>
<u>Stonewall Ins. Co.</u>, 86 F.3d 601, 606 (6th Cir. 1996), <u>aff'g</u> 863
F. Supp. 599 (S.D. Ohio 1994) (Spiegel, S.J.)).   Deciding which
state's law applies is far more an art than a science.
<u>International Ins. Co.</u>, <u>supra</u>, 86 F.3d at 606 ("Within that
framework, a judge must balance principles, policies, factors,
weights, and emphases to reach a result, the derivation of
which, in all honesty, does not proceed with mathematical
precision.").   Thus, we proceed.

Contact (e) is divided equally between the home states and
Ohio, State Auto's principal place of business.   Contacts (a)

11

and (b) plainly favor each named Plaintiff's home state, but in the context of the facts alleged, these contacts are relatively unimportant.  See generally Jamhour v. Scottsdale Ins. Co., 211 F. Supp. 2d 941, 949-50 (S.D. Ohio 2002) (Sargus, J.).  None of the homeowners's "negotiated" their policies in the true sense of the word.  Most significant we believe, contrary to Plaintiffs' argument, are contacts (c) and (d), both of which greatly favor the home states.  The crux of Plaintiffs' theory, as the Court understands it, is that they could never realize the benefit of their "bargain" with their insurer because they overpaid their premiums, ostensibly tied to inflated replacement values.  A residential home's replacement value, like its market value, is very much tied to its physical location.  This inextricable bond weighs heavily in favor of the home states.  Hence, we will assess whether the contract claims alleged survive Defendants' motion to dismiss by applying Kentucky law to the claims of the Schumacher Plaintiffs, Ohio law to the claims of the Evans and Maier Plaintiffs, and Indiana law to the Hendryx-Parker Plaintiffs.  The Court recognizes, however, that, as a practical matter, these may be distinctions without a difference considering that the common law elements of breach of contract are nearly identical in Kentucky, Ohio and Indiana.

To state a breach of contract claim, in Ohio and elsewhere, essentially four elements are required:  (1) a binding agreement

between two parties; (2) performance by the non-breaching party; (3) a failure to fulfill its obligation (without legal excuse) by the breaching party; and (4) consequent damages incurred by the non-breaching party.  <u>See</u> <u>Maxey v. State Farm Fire & Cas.</u> <u>Co.</u>, 689 F. Supp. 2d 946, 950 (S.D. Ohio 2010) (Spiegel, S.J.). Clearly the parties entered into a binding agreement. Defendants argue, however, that Plaintiffs have not identified— indeed cannot identify—any terms of their respective insurance policies that have been breached.  Plaintiffs, on the other hand, refer to the declaration sheets associated with their policies that contain the statement, "DUE TO REPAIR AND REPLACEMENT COST INCREASES, SECTION I COVERAGES HAVE BEEN INCREASED BY 5.5%",[9] yet maintain that their Coverage A limits (the controlling coverage in Section I) actually increased far more than 5.5%.  Defendants counter that their pre-formation representation concerning the annual inflation adjustment cannot be "breached" by increasing the Coverage A limit as part of the ITV program, the explanation for which Plaintiffs received in a separate notice (<u>see</u> doc. 7 Exh. 2).

This Court agrees with Defendants.  An act or omission that occurs <u>before</u> a contract is formed cannot later be evidence of a alleged breach.  <u>See</u> <u>Walker v. Dominion Homes, Inc.</u>, 164 Ohio

---

[9]The "5.5%" figure is but one example, drawn from the declaration sheet associated with the policy issued to the Schumacher Plaintiffs for the period 10/19/12-10/19/13 (<u>see</u> doc. 7 Exh. 5).

App. 3d 385, 397, 2005-Ohio-6055, 842 N.E.2d 570, 580, ¶ 35.  It follows, therefore, that neither can it be evidence of a failure of the duty to act in good faith.  See Bryan v. Bank of Am. Home Loans Serv., LP, No. 3:10 CV 959, 2011 WL 5526071, at *3 (N.D. Ohio Nov. 14, 2011) (Katz, J.) ("Plaintiffs assert a separate claim for bad faith breach of contract; however, Ohio law incorporates bad faith into a normal contract claim." (citations omitted)).[10]  Accordingly, Counts V and VI are appropriately DISMISSED.

## C. Tort Claims

Section 145 provides:

(1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.

(2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:

> (a) the place where the injury occurred,
>
> (b) the place where the conduct causing the injury occurred,
>
> (c) the domicile, residence, nationality, place of incorporation, and place of business of the parties, and

---

[10]Bad faith is one form of breach that may allow for extra remedies, namely attorney's fees.  Bryant, supra, 2011 WL 5526071, at *3 (citing LEH Properties v. Pheasant Run Ass'n, No. 10CA009780, 2011 WL 378783, 2011-Ohio-516, at ¶ 22 (Ohio Ct. App. 9 Feb. 7, 2011).

> (d) the place where the relationship, if any, between the parties is located.
>
> These <u>contacts are to be evaluated according to their relative importance</u> with respect to the particular issue.

Restatement (Second) of Conflict of Laws § 145 (1971) (emphasis added).  On balance, we conclude that Ohio law should apply to all tort claims.

Plaintiffs have alleged a broad-ranging scheme ostensibly conceived by Defendants at their national headquarters and principal place of business in Columbus, Ohio.  To recoup substantial underwriting losses caused by claims paid to homeowners in the wake of a variety of natural disasters, State Auto put in place a six-step "Homeowners Remediation" plan (<u>see</u> doc. 7 ¶¶ 48-49).  It included the earlier-described ITV program, a feature that, once added to the Defender Endorsement, permitted State Auto to unilaterally adjust their policyholders' Coverage A limits, which, in turn, automatically adjusted the limits for Coverage B, Coverage C and Coverage D, as all three are dependent on Coverage A.  These upward adjustments naturally resulted in higher premiums being paid.  Further, it allowed for the collection of increased revenue without taking the more transparent step of raising premium <u>rates</u>, an approach to which policyholders are characteristically averse.  According to Plaintiffs, State Auto intentionally overstated the costs to rebuild their homes, such that they were charged for a benefit

that they did not need, and, in the event of an occurrence, would never realize.  Execution of this purported ruse likewise is based in Columbus, Ohio, as the framework supporting it—correspondence, policies and declaration sheets distributed by insurers to their insureds—issues from State Auto's national headquarters and principal place of business.  Contacts (c) and (d), then, favor Ohio, as do contacts (a) and (b), because the supposed injury to Plaintiffs originated with the large-scale implementation of this program.  Thus, Ohio law will govern Plaintiffs' tort claims and inform the Court's decision as to whether they survive Defendants' motion.[11]

Defendants are correct that, under Ohio law, an insurance company's duty of good faith and fair dealing toward its insured is not limitless.  It is owed in the classic instance of settling a claim covered under the policy.  See Zoppo v. Homestead Ins. Co., 71 Ohio St. 3d 552, 644 N.E.2d 397 (1994).  Yet it appears to not be owed in the decision of whether to offer a renewal policy.  See The Andersons, Inc. v Factory Mut. Ins. Co., No. 3:01-CV-7620, 2003 WL 25875557, at *4 (N.D. Ohio

---

[11]Defendants rely on Pilgrim v Universal Health Card, LLC, 660 F.3d 943 (6th Cir. 2011) in support of their position that the law of each Plaintiff's home state should apply.  However, in Pilgrim, the healthcare discount program at issue "did not operate the same way in every State and the plaintiffs suffered distinct injuries as a result."  Id. at 947-48.  Here, though, the ITV program described by Plaintiffs is formulaic in nature and therefore does operate in the same way in every state. Thus, we consider Pilgrim inapposite.

Sept. 3, 2003) (Katz, J.).  The facts alleged by Plaintiffs in their complaint, however, are not so basic.  They contend that Defendants concocted a plot—in the form of the ITV component of their "Homeowners Remediation" plan—to sizably increase their premium revenue by selling an overpriced and superfluous product to their insureds, particularly those with whom they have had an on-going relationship.  As a result these insureds were denied the benefit of their bargain, and citing to Greenberg v. The Life Ins. Co. of Virginia, 177 F.3d 507 (6th Cir. 1999)[12], Plaintiffs argue that this conduct constitutes a breach of the duty of good faith and fair dealing.  This Court agrees that these allegations plausibly state such a claim.  Iqbal, supra, 556 U.S. at 678.  Accordingly, Defendants' motion to dismiss Count I is DENIED.

---

[12]In Greenberg, two sisters owned three paid-up policies on the life of their father.  An agent persuaded them that it would be to their financial advantage to surrender these policies and then purchase new ones that would require only a "single-premium" payment.  Within a year, however, the sisters discovered that considerable extra payments would be needed to keep these policies in force.  Id. at 510-11.  The Sixth Circuit concluded that Ohio law would recognize that the sisters stated a claim for a breach of the duty of good faith and fair dealing "because they did not receive the benefits that they reasonably believed would flow from their policies."  Id. at 520 (citing Buckeye Union Ins. Co. v. State Farm Mutual Automobile Ins. Co., Nos. C-960282, A-9100556, 1997 WL 180278, at *7 (Ohio App. 1 Dist. Apr. 16, 1997)).

We also find the separate claims of fraud[13] and negligent misrepresentation[14], combined in Count II, each sufficiently pled.  Fraud claims must be pled with "particularity" under Fed. R. Civ. P. 9(b).  Yet despite this heightened standard, trial courts must avoid too exacting a review.  <u>Michaels Bldg. Co. v. Ameritrust Co., N.A.</u>, 848 F.2d 674, 680 (6th Cir. 1988) ("Rule 9(b) does not require omniscience; rather, the Rule requires that the circumstances of the fraud be pled with enough specificity to put defendants on notice as to the nature of the claim.").  A plaintiff must supply "sufficient detail—in terms of time, place and content, the nature of a defendant's fraudulent scheme, and the injury resulting from the fraud—to

---

[13]To prevail on a fraud claim in Ohio, a plaintiff must prove these elements:  (1) a representation; (2) material to the transaction; (3) made falsely, with knowledge of falsity; and (4) with the intention of misleading another into relying on it. He or she also must prove (5) justifiable reliance on the representation; and (6) an injury proximately caused by said reliance.  <u>Burr v. Bd. of Cnty. Commr's</u>, 23 Ohio St. 3d 69, 491 N.E.2d 1101, 1102, syl. ¶ 2 (1986).

[14]A claim for negligent misrepresentation requires proof of the following:

> One who, in the course of his [or her] business, . . . supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he [or she] fails to exercise reasonable care or competence in obtaining or communicating the information.

<u>Gutter v. Dow Jones, Inc.</u>, 22 Ohio St. 3d 286, 288, 490 N.E.2d 898, 900 (1986) (quoting Restatement (Second) of Torts § 552 (1977)).

18

allow the defendant to prepare a responsive pleading[.]" <u>See</u> <u>United States ex rel. SNAPP, Inc. v. Ford Motor Co.</u>, 532 F.3d 496, 504 (6th Cir. 2008) (citing <u>United States ex rel. Bledsoe v.</u> <u>Cmty. Health Sys., Inc.</u>, 501 F.3d 493, 506 (6th Cir. 2007)). To require more, however, would invite unduly harsh results inconsistent with Fed. R. Civ. P. 8(a)(2)'s touchstone "notice pleading". <u>Michaels</u>, <u>supra</u>, 848 F.2d at 679-80.

Upon consideration, we believe that the allegations within the First Amended Complaint adequately satisfy the idiomatic "who, what, where, when, and why" survey. Plaintiffs identify "State Auto Insurance Companies"—the trade-name under which Defendants State Auto Mutual and State Auto Property and Casualty[15] operate—as the maker of the statements. This name appears prominently on all of the forms and letters issued to Plaintiffs from Defendants' national headquarters, as well as on the "Agency Bulletin" describing the ITV program. (<u>See</u> doc. 7 ¶¶ 184-85 & Exhs. 1-16.) Plaintiffs also pinpoint the statements they believe to be material misrepresentations: the need for them to add the Defender Endorsement in order to receive full replacement cost coverage (doc. 7 ¶¶ 203-04, 229); the need to increase their coverage limits in order to receive full replacement cost coverage (<u>id.</u> ¶¶ 205-07, 230); and the

---

[15]As discussed <u>infra</u>, even though it, too, operates under this same trade-name, State Auto Financial Corporation is correctly dismissed from this litigation.

19

percentage amount by which their coverage limits actually increased over the preceding year (id. ¶¶ 208-10, 231-33). Plaintiffs further allege that Defendants knew their representations were false and were made with the express intent of increasing premium revenue without increasing underwriting risk. (See, e.g., id. ¶¶ 32, 36, 213-16, 234-35.) Plaintiffs specify their alleged injuries in the form of excessive premiums paid and proximately-caused anxiety and emotional distress (id. ¶¶ 218, 237).

Defendants contend that the so-called material misrepresentations were merely opinions, not facts, and therefore not actionable. See Ohio Police & Fire Pension Fund v. Standard & Poor's Fin. Servs., LLC, 700 F.3d 829, 842-44 (6th Cir. 2012 ) (credit rating not an actionable misrepresentation). The Court believes otherwise. The cost to replace a home in the event of a calamity is indeed an estimate, but it is one grounded in actual brick-and-mortar expense that is "susceptible of knowledge". See id. at 842 (quotations and citations omitted). It simply is not dependent upon subjective opinion. Moreover, Plaintiffs quite properly relied on Defendants' superior knowledge of premiums to support reconstruction, an integral part of their underwriting process, as they are in the business of paying to have homes rebuilt when disaster strikes. Finally, that Plaintiffs had the ability to cancel their

policies at any time and receive a pro rata refund of the premiums paid offers no cure. Any refunds received still would not compensate Plaintiffs for that portion of the purported fraudulently-inflated premiums retained by Defendants.

Plaintiffs have satisfied the standard of pleading required by Rule 9(b). To borrow from our colleague Judge Frost, "to conclude otherwise would encourage a disingenuous game of 'gotcha' litigation in which a pleading is read neither in context nor with attention to the obvious." Jennings v. Bodrick, No. 2:09-cv-208, 2009 WL 1607711, at *4 (S. D. Ohio June 9, 2009) (Frost, J.). They also have satisfied the standard of pleading required by Rule 8(a) concerning their claim of negligent misrepresentation, which, under Ohio law, merits separate treatment. See Rheinfrank v. Abbot Labs., No. 1:13-cv-144, 2013 WL 4067826, at *3-4 (S.D. Ohio Aug. 12, 2013) (Dlott, C.J.). Plaintiffs contend they bargained for, and understood they were paying, premiums necessary to assure 100% replacement coverage. In fact, however, on the advice of Defendants, Plaintiffs aver that they paid inflated premium amounts tied to coverage limits that patently exceeded the cost to rebuild their homes. They paid more, but could never have collected more, the victims of the enhancing effect of Defendants' ITV program vis-à-vis their Defender Endorsement.

These allegations are more than adequate to survive a motion to dismiss.

Lastly, having determined that Plaintiffs' fraud claim can advance, we similarly decide that their fraud in the inducement claim (Count IV) may as well. While the former speaks to the nature of the contract itself, the latter concerns misrepresentations that persuaded a party to agree to it in the first place. See ABM Farms, Inc. v. Woods, 81 Ohio St. 3d 498, 502, 692 N.E.2d 574, 578 (1998) (quoting Haller v. Borror Corp., 50 Ohio St. 3d 10, 14, 552 N.E.2d 207, 210 (1990)). Thus, with their focus on discrete periods in the business relationship, these claims are not necessarily redundant and can proceed in tandem. Their elements, however, are fundamentally the same, see Inhalation Plastics, Inc. v. Medex Cardio-Pulmonary, Inc., No. 2:07-cv-116, 2011 WL 2293228, at *3 (S.D. Ohio June 8, 2011) (Smith, J.) (citing Stegawski v. Cleveland Anesthesia Group, Inc., 37 Ohio App. 3d 78, 83-84, 523 N.E.2d 902, 908-09 (Ohio App. Dist. 8 1987)), and thus no further analysis is necessary. Accordingly, Defendants' motion to dismiss Counts II and IV is denied.

### D. Ohio Deceptive Trade Practices Act Claim

Defendants argue that they are entitled to judgment as a matter of law on Plaintiffs' claims brought under the Ohio Deceptive Trade Practices Act (ODTPA), Ohio Rev. Code §§ 4165.01

et seq., because, as consumers, Plaintiffs lack standing to bring suit.   The Ohio Supreme Court has not yet resolved the issue of whether a consumer may pursue a claim under the ODTPA[16]; thus, we must do our best to anticipate how it might rule.   See Mazur v. Young, 507 F.3d 1013, 1016-17 (6th Cir. 2007).

There is a split of authority between the Northern and Southern Districts of Ohio, and even within the Southern District, on the subject.   Our colleague in the Western Division, the Honorable Walter H. Rice, has determined that a consumer can bring a cause of action, relying on the plain language of the statute.   Bower v. Int'l Bus. Machs., Inc., 495 F. Supp. 2d 837, 842-44 (S.D. Ohio 2007) (Rice, J.).   The ODTPA states in relevant part, "A person who is injured by a person who commits a deceptive trade practice . . . may commence a civil action . . . ."   Ohio Rev. Code § 4165.03(A)(2) (emphasis added).   A "person" is defined as:

> an individual, corporation, government, governmental subdivision or agency, business trust, estate, trust partnership, unincorporated association, limited liability company, two or more of any of the foregoing having a joint common interest, or any other legal or commercial entity.

---

[16]In McKinney v. Bayer Corp., Judge O'Malley certified to the Ohio Supreme Court the question of a consumer's standing under the ODTPA.   744 F. Supp. 2d 733, 749-752 (N.D. Ohio 2010).   But because the plaintiff dismissed his ODTPA claim, this issue never was addressed by the Court.   Robins v. Global Fitness Holdings, LLC, 838 F. Supp. 2d 631, 650 n.3 (N.D. Ohio 2012) (Polster, J.).

Ohio Rev. Code § 4165.01(D) (both emphases added). Judge Rice reasoned that Section 4165.01(D) provides a "long list" of all those considered a "'person'" under the statute, and the words at the end of that long list—prefaced by "'any other'"—serve to expand, not contract, its scope. Id. at 843. He noted that the statute is otherwise silent with regard to any mention of "consumers," and there is no limit expressed within the statute "on the type of individuals who can pursue a claim[.]" Id. Accordingly, he rejected the argument that the ODTPA applies only to commercial entities and not to consumers. Id. at 844. In so ruling, Judge Rice rejected the result reached in two unreported cases out of the Northern District of Ohio as being "of limited precedential value in deciding the intent of the Ohio State Legislature in enacting the [O]DTPA." Id. at 842 (construing Chamberlain v. American Tobacco Co., No. 1:96-CV-02005-PAG, 1999 WL 33994451, at *18 (N.D. Ohio Nov. 19, 1999) (Gaughan, J.) and Glassner v. R. J. Reynolds Tobacco Co., No. 5:99CV076, 1999 WL 33591006, at *6 (N.D. Ohio June 29, 1999) (Dowd, J.)).

Since Judge Rice's decision in Bower, various district judges within the Northern District have been presented with the question of whether consumers have standing to sue under the ODTPA, and they have consistently (and much more comprehensively than in Chamberlain and Glassner) ruled that they do not.

24

Phillips v. Philip Morris Cos., Inc., 290 F.R.D. 476, 482-85 (N.D. Ohio 2013) (Lioi, J.); Robins v. Global Fitness Holdings, LLC, 838 F. Supp. 2d 631, 649-50 (N.D. Ohio 2012) (Polster, J.).[17] Judge Lioi, for example, relied largely on Blankenship v. CFMOYO Powersports, Inc., 161 Ohio Misc.2d 5, at ¶¶ 21-29, 2011-Ohio-948, 944 N.E.2d 769, 778 (Clermont Co. Com. Pl.). Blankenship criticized Bower for failure to acknowledge that the ODTPA is "'substantially similar to the federal Lanham Act,'" and that "[a]t least half of the [federal] circuit[ courts of appeals] hold (and none of the others disagree) that . . . the Lanham Act[] . . . bars a consumer from suing under the act." Blankenship, 161 Ohio Misc.2d 5, at ¶¶ 21, 22 (quoting Dawson v. Blockbuster, Inc., No. 86451, 2006-Ohio-1240, 2006 WL 1061769, ¶¶ 21-26 (Ohio App. 8 Dist. Mar. 16, 2006) (emphasis added in Blankenship))[18].

In the Southern District, Judge Smith, of the Eastern Division, also has disagreed with conclusion reached by Judge Rice in Bower, observing "[s]imply because the statute does not expressly place any limitation on the type of individuals who

---

[17]A district court in California also has come to this conclusion. See In re Oreck Corp. Halo Vacuum & Air Purifiers Mktg. & Sales Practices Litig., No. ML 12-2317 CAS (JEMx), 2012 WL 6062047, at *11 (C.D. Cal. Dec. 3, 2012).

[18]See Made in the USA Found. v. Phillips Foods, Inc., 365 F.3d 278, 280 (4th Cir. 2004) (Second, Third, Fourth, Fifth, Seventh, Ninth and Tenth Circuit Courts of Appeal deciding consumers lack standing under the Lanham Act).

can pursue a claim does not mean that none exists." <u>Gascho v.</u>
<u>Global Fitness Holdings, LLC</u>, 863 F. Supp. 2d 677, 698 (S.D.
Ohio 2012) (Smith, J.).[19] He, too, remarks that <u>Bower</u> fails to
acknowledge that "Ohio courts look to [how federal circuit
courts of appeals construe] the Lanham Act when adjudicating
claims under the [O]DTPA." <u>Id.</u> at 698 (citing <u>Chandler &</u>
<u>Assocs., Inc. v. Am.'s Heathcare Alliance, Inc.</u>, 125 Ohio App.
3d 572, 580, 709 N.E.2d 190, 195 (1997)). To this end, Judge
Smith highlights <u>Dawson</u>, <u>supra</u>, decided pre-<u>Bower</u>, as a
presumptively illustrative authority. <u>Id.</u> at 698-99. Judge
Frost, also of the Eastern Division, similarly has disagreed
with the <u>Bower</u> holding, twice in fact. <u>Allen v. Andersen</u>
<u>Windows, Inc.</u>, 913 F. Supp. 2d 490, 513 (S.D. Ohio 2012) (Frost,
J.); <u>In re Porsche Cars N. Am., Inc.</u>, 880 F. Supp. 2d 801, 873-
75 (S.D. Ohio 2012) (Frost, J.). So, too, has Judge Sargus.
<u>Lester v. Wow Car Co., Inc.</u>, No. 2:11-cv-850, 2014 WL 2567087,
at *11-12 (S.D. Ohio June 6, 2014) (Sargus, J.). And, relying
on <u>Gasco</u> and <u>In re Porsche</u>, our colleague in the Western
Division, Judge Barrett, has as well. <u>Smith v. Smith & Nephew,</u>

---

[19]While Defendants failed to cite <u>Gascho</u>, they did cite
<u>Citimortgage, Inc. v. Crawford</u> for the proposition that a
consumer lacks standing to sue under the ODTPA. No. 1:11-cv-
714, 2013 WL 1225387, at *6 (S.D. Ohio Mar. 26, 2013) (Black,
J.). We note, however, that the defendants <u>conceded</u> that the
lacked standing to pursue counterclaims under the ODTPA, and
thus our colleague Judge Black did not actually reach the issue.

Inc., --- F. Supp. 2d ---, No. 1:13-cv-289, 2014 WL 934541, at *2 (S.D. Ohio Mar. 10, 2014) (Barrett, J.).

Our own research reveals that another Ohio appellate court recently has ruled that consumers lack standing to file suit under the ODTPA. Hamilton v. Ball, No. 13CA3533, 2014-Ohio-1118, 2014 WL 1339634, at ¶¶ 29-33 (Ohio App. 4 Dist.). Moreover, that portion of the decision in Holbrook v. Louisiana-Pacific Corp., No. 3:12CV484, 2012 WL 3801725, at *4-5 (N.D. Ohio Aug. 12, 2012) (Carr, S.J.), cited by Judge Lioi in Phillips for the proposition that the "[O]DTPA is not available to consumers[,]" was affirmed by the Sixth Circuit on July 12, 2013, some two months prior to oral argument on the instant motion to dismiss. Holbrook v. Louisiana-Pacific Corp., 533 Fed. App'x 493, 497-98 (6th Cir. 2013). The analysis of this issue at the district court and appellate levels is sparse, however, and the Sixth Circuit's decision is unpublished and therefore lacks binding precedential value. S.J. v. Hamilton County, 374 F.3d 416, 423 n.5 (6th Cir. 2004); Smith v. Grady, 960 F. Supp. 2d 735, 753 (S.D. Ohio 2013) (Barrett, J.).

Upon consideration, this Court concludes that Judge Rice has engaged in the better statutory analysis and we adopt it as our own. The limited number of Ohio lower courts to have considered this issue immediately jump to a comparison of the ODTPA with the Lanham Act without first considering the actual

27

language of the ODTPA.  That language plainly provides that a "person" may "commence a civil action" against another "person" who has committed a "deceptive trade practice[,]" and included within the statutory definition of "person" is an "individual" along with a litany of legal or commercial entities, with the catch-all phrase "or any other legal or commercial entity[]" at the end.  See Ohio Rev. Code §§ 4165.01(D), 4165.03(A)(2).  One might well ask the question why the word "individual" was included in the definition had the Ohio General Assembly not intended to give individual consumers the standing to sue under the ODTPA.  See State ex rel. General Elec. Supply Co. v. Jordano Elec. Co., 53 Ohio St. 3d 66, 71, 558 N.E.2d 1173, 1177 (1990) ("'In determining intent, it is the duty of this court to give effect to the works used, not to delete words used or insert words not used.'" (citation omitted)).  An "individual" is an "indivisible entity . . . relating to a single person or thing, as opposed to a group" while an "entity" is an "organization (such as a business. . . ) that has a legal identity apart from its members."  Black's Law Dictionary 612, 843 (9th ed. 2009).  Therefore, as Judge Rice before us, we construe that catch-all phrase "or any other legal or commercial entity[]" to modify all the other "entities" listed before it, with no dedication to restrict the ordinary definition of "individual."

28

Having decided that an individual consumer does have standing to sue under the ODTPA, we address next Defendants' argument that Plaintiffs have failed to specify which of the thirteen deceptive trade practices listed they allegedly have committed. See Ohio Rev. Code § 4165.02(A)(1)-(13). In their memorandum contra, Plaintiffs respond by referring to two subsections, contending that Defendants' scheme violated the prohibitions against "[r]epresent[ing] that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have . . . " and [a]dvertis[ing] goods or services with intent not to sell them as advertised[.]" See id. §§ 4165.02(A)(7) and 4165.02(A)(11), respectively. The Court is satisfied with these references. Accordingly, Defendants' motion to dismiss Count III is DENIED.

## E. Defendant State Auto Financial Corporation Should Be Dismissed

Defendant State Auto Financial Corporation seeks dismissal from this lawsuit because there are no allegations that it contracted with, or made any representations to, any of the named Plaintiffs. None of the declaration pages attached as Exhibits 3 through 17 to the First Amended Class Action Complaint reference the Financial Corporation, and the Amended Complaint itself recites simply that it is "a subsidiary of Defendant State Automobile Mutual Insurance Company[.]" See

29

doc. 7 ¶ 7.  Lacking privity with any of the named Plaintiffs, the Financial Corporation asserts it cannot be subject to liability.  See, e.g., Justice v. Nationwide Ins. Co., No. 98AP-1083, 1999 WL 333242, at *4 (Ohio Ct. App. May 27, 1999). Plaintiffs' response is nominal, maintaining that the Financial Corporation operates under the trade-name "State Auto Insurance Companies" just as the other two Defendants (State Auto Mutual and State Auto Property and Casualty) do and, thus, is "liable for the acts performed and the liability incurred in that name[]" (see doc. 15 at 20).

We disagree.  The Court finds well-taken the position that distinct companies do not lose their independence even though operating through trade names.  See generally Sportscare of Am., P.C. v. Multiplan, Inc., No. 2:10-cv-04414, 2013 WL 1661018, at *15-16 (D.N.J. Apr. 17, 2013); Nextfood, Inc. v. Healthcare Foodservice Sourcing Advantage, Inc., No. 09-CV-2148 EFM/KMH, 2011 WL 346080, at *2 (D. Kan. Feb. 2, 2011).  Accordingly, Defendant State Auto Financial Corporation is properly DISMISSED from this litigation.

**F. The Evans and Hendryx-Parker Plaintiffs Should Be Dismissed**

Defendants ask that Plaintiffs Mary Carmen Evans and Calvin and Gabrielle Hendryx-Parker be dismissed because the declaration pages attached as Exhibits 6 through 9 and 14 through 17 to the First Amended Class Action Complaint show that

30

they were insured by State Auto Insurance Company of Ohio and Meridian Security Insurance Company, respectively, and neither insurer has been named a defendant in this action.  Plaintiffs respond that Ms. Evans and Mr. and Mrs. Hendryx-Parker are in privity with Defendants because their insurers operate under the trade-name "State Auto Insurance Company."  In the alternative, Plaintiffs request leave to amend their Amended Complaint to rectify any deficiency.

Defendants reply that we should dismiss the First Amended Class Action Complaint "due to Plaintiffs' basic failure to observe corporate formalities alone[]" (doc. 16 at 19).  They further argue that it would be an abuse of our discretion to grant leave to amend in this instance.  <u>Wade v. Knoxville Utilities Bd.</u>, 259 F.3d 452 (6th Cir. 2001).  Defendants are incorrect.  The list of factors set forth by the Sixth Circuit are as follows:

> Undue delay in filing, lack of notice to the opposing party, bad faith by the moving party, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing party, and futility of amendment are all factors which may affect the decision.  Delay by itself is not sufficient reason to deny a motion to amend.  <u>Notice and substantial prejudice to the opposing party are critical factors in determining whether an amendment should be granted</u>.

<u>Id.</u> at 458-59 (emphasis added).  Defendants assert, with little elaboration, that "[e]ssentially all" of these factors weigh in their favor, but the Court reaches just the opposite conclusion.

31

There is no evidence of undue delay.  The Schumacher Plaintiffs filed the original complaint on April 8, 2013, and the amended complaint was filed on May 17, 2013.  Defendants filed the instant motion to dismiss on June 10, 2013, with Plaintiffs filing their memorandum in opposition, in which they alternatively ask for leave to amend, on July 2, 2013.  This time-line hardly bespeaks undue delay.  There has only been one previous amendment, which was filed within six weeks of the original complaint and before Defendants were required to answer or otherwise plead under the civil rules.  This circumstance is not representative of "repeated failure to cure deficiencies." Inasmuch as we are denying Defendants' motion to dismiss the common law claims sounding in tort as well as the claims brought pursuant to the ODTPA, an amendment for the purpose of naming additional defendants would not be futile.  No prejudice can attach as there are no case management dates yet in place. Finally, any cry of lack of notice would be slightly disingenuous.  Review of the First Amended Class Action Complaint reveals the following allegation:

> State Automobile Mutual Insurance Company, the corporations it owns, and is subsidiaries, such as . . . State Auto Insurance of Ohio, . . . [and] Meridian Security Insurance Co., . . . are collectively known as "State Auto Insurance Companies," a registered trade name of State Automobile Mutual Insurance Company.

(Doc. 7 ¶ 11 (emphasis added).)  Defendant State Auto Mutual Insurance Company clearly was on notice of the alleged involvement of its various subsidiaries, including the two at issue.  But even though State Auto Ohio and Meridian operated under the trade-name "State Auto Insurance Companies," they are separate corporate entities and thus they should have been named as party defendants when Ms. Evans and Mr. and Mrs. Hendryx-Parker were added as named Plaintiffs upon the filing of the First Amended Class Action Complaint.  Accordingly, the Evans and Hendryx-Parker Plaintiffs are DIMISSED WITHOUT PREJUDICE. The Court, however, will favorably entertain a motion for leave to file a second amended complaint, with a proposed complaint attached, that would return Ms. Evans and Mr. and Mrs. Hendryx-Parker as named Plaintiffs and add State Auto Insurance Company of Ohio and Meridian Security Insurance Company as named Defendants.

## IV.  Conclusion

To summarize, the Motion to Dismiss by Defendants State Automobile Mutual Insurance Company, State Auto Financial Corporation, and State Auto Property and Casualty Insurance Company (doc. 8) is **GRANTED IN PART and DENIED IN PART**. **Defendant State Auto Financial Corporation is DISMISSED** from this litigation.  **Plaintiffs Mary Carmen Evans and Calvin and Gabrielle Hendryx-Parker are DIMISSED WITHOUT PREJUDICE** from

33

this litigation.  Plaintiffs' common law claims for breach of contract (**Count V**) and breach of the duty of good faith and fair dealing (**Count VI**) are **DISMISSED**.  In all other respects, Defendants' Motion to Dismiss is **DENIED**.  Pursuant to the case management overview discussed at the conclusion of oral argument, the following pretrial deadlines are now in place: **discovery** will be completed by **June 1, 2015**; **dispositive motions** will be filed by **July 1, 2015**; a **final pretrial conference** will be held on **September 29, 2015** at 2:00 p.m., with a **five-day jury trial** scheduled for **October 20, 2015**, on an on-deck basis.

        SO ORDERED.

Date:  September, 18, 2014    <u>s/S. Arthur Spiegel_____</u>
                                     S. Arthur Spiegel
                                   United States Senior District Judge